J. S83014/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: E.G.J., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.J., BIRTH MOTHER | : | No. 780 WDA 2016 |

Appeal from the Order Entered May 3, 2016,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at No. CP-02-AP-0000011-2016

| | | |
|---|---|---|
| IN RE: B.J., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.J., BIRTH MOTHER | : | No. 781 WDA 2016 |

Appeal from the Order Entered May 3, 2016,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at No. CP-02-AP-00010-2016

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:     **FILED JANUARY 06, 2017**

R.J. ("Mother") appeals from the orders dated May 2, 2016, and entered May 3, 2016,[1] in the Court of Common Pleas of Allegheny County,

---

* Retired Senior Judge assigned to the Superior Court.

[1] While the order was dated May 2, 2016, notice pursuant to Pa.R.C.P. 236 was not provided until May 3, 2016. ***See Frazier v. City of Philadelphia***, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given").

Orphans' Court Division, granting the petition of the Allegheny County Office of Children, Youth and Families ("OCYF") and involuntarily terminating her parental rights to her dependent children, daughter, E.G.J., born in March of 2008, and son, B.V.J., born in August of 2006 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[2] After review, we affirm.

The trial court summarized the relevant procedural and factual history, in part, as follows:

> . . . OCYF became involved with this family on June 19, 2014, subsequent to allegations made by Mother's oldest child, J.J., that [Father] was sexually abusive. As a term of his bond, Father was ordered to leave the home and have no contact with his children.[3] On September 2, 2014, OCYF learned during a forensic interview that Father stayed overnight in the family's home. Father was arrested for Violation of Bond and Mother was arrested for Endangering the Welfare of Children. The Children were placed with family members.
>
> A Court Order on October 17, 2014, placed the Children with their Maternal Aunt [] at Mother's

---

[2] By the same orders, the trial court also involuntarily terminated the parental rights of Children's father, T.J. ("Father"), also pursuant to Sections 2511(a)(2), (5), (8), and (b). Father has filed appeals at Superior Court Docket Nos. 776 and 777 WDA 2016, addressed by separate memorandum.

[3] A criminal no contact order was in place with regard to Father and J.J. Mother was to supervise any contact between Father and the other children. (Notes of testimony, 5/2/16 at 11-12.)

request.[4]  They have remained in her care since that time.  On November 7, 2014, the Children were adjudicated dependent under Section (1) as to Mother because:

[H]er conduct in light of her knowledge that [J.J.] has made these allegations [of sexual abuse against Father] . . . demonstrates impaired [judgment] and impaired parenting, which has resulted in all of the children being without proper care and control.  Mother did not readily schedule the forensic evaluations for the other children, and she continued to have contact with Father.  Further, based on the testimony of the police detective, it can be inferred that Mother influenced [J.J.] to decline the rape kit and recant her testimony.[5]

OCYF developed an Initial Family Service Plan (hereinafter, "FSP") which listed the following goals for Mother:  1) ensure Father does not return to the residence; 2) come to an understanding of the impact of sexual abuse; and 3) relocation.  The FSP goals remained the same throughout the entirety of the case.

In May of 2015, the Children alleged sexual abuse by Father.  On June 4, 2015, Mother pled guilty to the charge of Endangering the Welfare of Children and was placed on probation.  On June 17, 2015, the Children made allegations of abuse against Mother which were later determined to be unfounded.  The Children continued to allege abuse after the initial claims were made.

---

[4] Children were initially informally placed with extended family members following Mother's arrest in September 2014.  Children were then placed with maternal aunt in Ohio on October 17, 2014.  (Notes of testimony, 5/2/16 at 13-16.)

[5] Children's three older siblings, who are placed separately, were also adjudicated dependent.  In adjudicating Children dependent, the court additionally considered the behavior of Father.  (Notes of testimony, 5/2/16 at 18-20.)

>        In August of 2015, Father was convicted of sexual abuse against J.J. and incarcerated. Mother wrote a letter to the Judge presiding over Father's criminal case and asked for leniency asserting that he was a good man and that she wanted Father to remain in the Children's lives.
>
>        Prior to November 2015, Mother was not permitted to have contact with the Children.[6] In a Court Order on November 20, 2015, Mother was permitted to contact the Children by Skype or by phone during therapy sessions with Ms. Sophia Sparks [], a therapist with New Reflections Counseling.
>
>        On February 12, 2016, this Court permitted Mother to have supervised visits with the Children once a month.

Trial court opinion, 7/25/16 at 3-5 (footnotes omitted and citations to record omitted).

On January 25, 2016, OCYF filed petitions to involuntarily terminate parental rights. Thereafter, the trial court conducted a hearing on May 2, 2016.[7] In support of the termination petitions, OCYF presented the testimony of Clare Chiaverini, CYF caseworker; Dr. Beth Bliss, licensed psychologist, who performed a risk assessment of Father and individual and

---

[6] Children were, however, permitted to have supervised contact with Mother at a family funeral. (Notes of testimony, 5/2/16 at 39-40.)

[7] A permanency review hearing with regard to Children's three older siblings was also conducted at this time.

interactional evaluations of Children, Mother, and Maternal Aunt;[8] and Sophia Sparks, Children's therapist. Mother testified on her own behalf. Mother additionally presented the testimony of her brother, S.M. Father, who is incarcerated, was present, but did not testify.

By order dated May 2, 2016, and entered May 3, 2016, the trial court involuntarily terminated Mother's parental rights to Children.[9] On June 2, 2016, Mother, through counsel, filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issue for our review:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that Allegheny County Children, Youth and Families met its burden of proving that termination of Birth Mother's parental rights would best serve the needs and welfare of the Children pursuant to 23 Pa. C.S.[A.] § 2511(b) by clear and convincing evidence when such determination is not supported by the record?

Mother's brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

---

[8] Dr. Bliss' assessments and/or evaluations were completed on November 24, 2014, September 29, 2015, and April 8, 2016, and were marked and admitted collectively as OCYF Exhibit 5 at the hearing on May 2, 2016.

[9] The trial court announced its decision, memorialized by subsequent order, on the record at the conclusion of the hearing on May 2, 2016.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially,

>the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, Mother concedes grounds for termination under Section 2511(a)(2). (*See* Mother's brief at 15.) We,

therefore, analyze the court's termination pursuant to Section 2511(b) only,

which provides as follows:

> **(b)  Other  considerations.--**The  court  in terminating  the  rights  of  a  parent  shall  give primary  consideration  to  the  developmental, physical  and  emotional  needs  and  welfare  of the  child.    The  rights  of  a  parent  shall  not  be terminated  solely  on  the  basis  of environmental  factors  such  as  inadequate housing,  furnishings,  income,  clothing  and medical  care  if  found  to  be  beyond  the  control of  the  parent.    With  respect  to  any  petition filed  pursuant  to  subsection  (a)(1),  (6)  or  (8), the  court  shall  not  consider  any  efforts  by  the parent  to  remedy  the  conditions  described therein  which  are  first  initiated  subsequent  to the  giving  of  notice  of  the  filing  of  the  petition.

23 Pa.C.S.A. § 2511(b).

With  regard  to  Section  2511(b),  our  supreme  court  has  stated  as

follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the  developmental,  physical  and  emotional  needs and welfare of the child."  23 Pa.C.S. § 2511(b).  The emotional  needs  and  welfare  of  the  child  have  been properly interpreted to include "[i]ntangibles such as love,  comfort,  security,  and  stability."    *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012).  In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires  consideration  of  the  emotional  bonds between  the  parent  and  child.    The  "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.  However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010), citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent . . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015), quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Instantly, in examining Section 2511(b) and determining whether termination of Mother's parental rights serves Children's needs and welfare, the trial court reasoned:

> This Court judiciously evaluated the bond between Mother and the Children and determined that there was no indication that an emotional bond exists to the extent that the termination of parental rights of Mother would cause the Children to suffer extreme emotional consequences. In reaching this conclusion, this Court weighed the totality of the circumstances and relied upon the testimony of Dr. Bliss who opined within a reasonable degree of psychological certainty that the Children should not be reunified with their Mother and should remain in [Maternal Aunt]'s care.

> The uncontroverted testimony established that the Children's needs are best met with [Maternal Aunt]. A strong bond exists between [Maternal Aunt] and the Children because the Children have been living in [Maternal Aunt]'s home since September of 2014 and were not in contact with their Mother for a significant period of time. While the Children may have been raised primarily with Mother, their bond is merely residual. The Court was within its discretion when it determined that bond is secondary and that severing the Children's bond with Mother would not cause extreme emotional consequences.

> . . . .

> After careful review of the record, the evidence presented unequivocally established that the Children do not have secure bonds with their Mother because they felt she was not consistent in meeting their needs. It is notable that the Children's desire for contact with Mother is limited and they have frequently stated that they want to continue living with [Maternal Aunt]. During a therapy session with Ms. Sparks, E.J. repeatedly indicated "that she feels

> safe and loved and wants to stay [with Maternal Aunt.]" B.J. stated that he is "in a safe place with [Maternal Aunt] and loved everyday. I felt unsafe with my parents. . .I love them, but don't want to live with them." The Children explicitly told Dr. Bliss that "they don't feel safe returning to [Mother.]" This Court credits Dr. Bliss' testimony that despite counseling, Mother does not seem to appreciate the seriousness of the sexual abuse of the Children. Dr. Bliss' recommendation of SPLC is so rife with limitations and parameters that it would not provide the Children with the much needed stability and permanence they require. Accordingly, the testimony presented demonstrated that termination would serve the Children's developmental, physical and emotional needs.

Trial court opinion, 7/25/16 at 7, 11 (citations to record omitted).

Mother, however, argues that a bond was present between her and Children. (Mother's brief at 17.) Moreover, Mother highlights that Dr. Bliss even testified that termination would not meet Children's needs and welfare at the time, as to dissolve this relationship would cause Children trauma. (*Id.*) Mother therefore avers that, while Dr. Bliss did not recommend reunification, the trial court failed to examine the emotional trauma that Children may suffer if her parental rights are terminated. (*Id.* at 17-18.) We disagree.

Upon review, the record supports the trial court's finding that Children's needs and welfare favor termination of Mother's parental rights. Children had been out of Mother's care for almost two years and had limited telephonic and supervised contact. (Notes of testimony, 5/2/16 at 13-16, 39-40, 52-54.) Although acknowledging love for Mother, Children

consistently made allegations of abuse against Mother and expressed a fear of returning to Mother's care and lack of safety. (*Id.* at 47-48, 130-131, 133, 135, 176-177, 181, 190, 192, 210, 225.) In addition, B.V.J. was diagnosed with post-traumatic stress disorder and E.G.J. with adjustment disorder related to the alleged abuse and situation involving OCYF. (*Id.* at 190, 192-193, 221.) Symptoms centered around court appearances, evaluations, or family visitation and/or contact. (Notes of testimony, 5/2/16 at 139, 145-146, 189-190; Exhibit 5, Psychological Evaluation 4/8/16, report dated 4/13/16, at 17, 18, 20.) Notably, Children initially declined some of the telephonic contact afforded with Mother. (Notes of testimony, 5/2/16 at 134-135.)

While Dr. Bliss recognized a bond with Mother and testified that severing the parent-child relationship between Mother and Children would not meet Children's needs and welfare at the time, she opined that Children should not be reunified with Mother and should remain in Maternal Aunt's care. (Notes of testimony, 5/2/16 at 223-224; Exhibit 5, Psychological Evaluation 4/8/16, report dated 4/13/16, at 19-20.) Significantly, Dr. Bliss indicated that Mother "doesn't seem to appreciate the seriousness of the sexual abuse of her children," noting, for example, the letter Mother wrote on behalf of Father to the judge presiding in his criminal case, as well as Mother's "emotionless" reaction regarding Children's allegations and their suffering. (*Id.* at 198-199; 18.) Dr. Bliss also testified that Mother had

difficulty placing the needs of Children ahead of her own. In support thereof, Dr. Bliss referenced that it was Mother's brother who convinced her to accept a plea bargain and keep her children from testifying against her. In addition, Dr. Bliss highlighted that Mother would keep Children from contact with Maternal Aunt, if reunified, due to Mother's own issues with Maternal Aunt, which could be "quite traumatic" for Children as Children are "very attached" to Maternal Aunt. (*Id.* at 199-200; 18.) Dr. Bliss likewise confirmed concerns regarding Mother's response to Children's emotional needs if they were reunified. (Notes of testimony, 5/2/16 at 208.) Further, Dr. Bliss concluded that Mother exhibited maladaptive cognitions or thinking errors, such as "not fully understanding that the Court and truth don't necessarily always have to go together." (Notes of testimony, 5/2/16 at 208-209; Exhibit 5, Psychological Evaluation 4/8/16, report dated 4/13/16, at 18.) Moreover, and more importantly, Children, feel safe with and desire to remain with Maternal Aunt, with whom Dr. Bliss observed they are bonded and have a "positive," "close" relationship. (*Id.* at 130, 133, 136, 138-139, 144, 149-150, 179, 184, 185, 196; 19.) E.G.J., in particular, "appeared strongly bonded" to Maternal Aunt. (*Id.* at 197; 19.) Thus, we conclude that the trial court did not abuse its discretion in finding termination of Mother's parental rights serves Children's needs and welfare pursuant to Section 2511(b).

Accordingly, based on the foregoing analysis of the trial court's termination of Mother's parental rights, we affirm the orders of the trial court.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/6/2017